DeBruine, Respondent, vs. Voskuil and another, Appellants.

*October 8—November 6, 1918.*

*Physicians and surgeons: Malpractice: Evidence: Instructions to jury: Choosing method of treatment: Negligence: Failure to use X-ray.*

1. In an action for malpractice a verdict to the effect that the stiffened condition of plaintiff's ankle was caused by failure of defendants to use ordinary care and skill in the treatment of her fractured leg, the bone in which failed to unite properly, is *held* not to be sustained by the evidence.
2. Instructions in such case so broad that they permitted the jury to speculate as to the probable cause of plaintiff's injuries are *held* to have been erroneous.
3. Physicians are not compelled to choose at their peril between two accepted methods of treatment; and the statement of an expert that he would have treated the fracture of plaintiff's leg in a way different from that adopted by defendants was incompetent.
4. If the treatment adopted was such as physicians or surgeons of ordinary knowledge and skill, of the same school of medicine and practicing in the same vicinity, would have used, the mere fact that a bad result followed is not sufficient to show negligence.
5. Failure of defendants to make or procure an X-ray examination of the fractured bone is *held* in this case not to have amounted to negligence or unskilful treatment. [Under what circumstances an inference of negligence or unskilful treatment might be drawn from such a failure, is not determined.]

Appeal from a judgment of the circuit court for Sheboygan county: Michael Kirwan, Circuit Judge. *Reversed.*

Malpractice.    This action was brought to recover dam-
ages from the defendants, who are both physicians, for in-
juries alleged to have been sustained by reason of negligence
on the part of the defendants in the care·and treatment of a
fracture of the tibia of the plaintiff's left leg.  The plaintiff,
a woman. forty-nine years of age, on November 5, 1916,
fractured the tibia of her left leg about two inches below
the knee.    The defendant *Voskuil* was sent for, and on ar-
riving at plaintiff's house and ascertaining the difficulty
sent for the defendant *Hess,* and together they reduced the
fracture and placed it in a fracture box in the ordinary way
with Buck's extension, attaching a weight of twenty-six
pounds thereto.    On December 20th the apparatus was re-
moved by the defendant *Voskuil,* a part of the weight hav-
ing been taken off one week previously.    At the time of the
removal of the apparatus the defendant *Voskuil* attempted
to ascertain whether or not union had taken place, but de-
sisted on account of complaints made by the plaintiff.  He
advised the plaintiff to use her leg.  He called again on De-
cember 27th and then discovered that there was no union
of the fragments. . He then advised an operation for the
purpose of fastening the ends of the bones together.
Plaintiff was then taken to a hospital in the city of She-
boygan, where Dr. Arthur Genter performed an open opera-
tion and fastened the bones together by means of what is
known as a Lane splint.  Plaintiff remained in the hospital
at Sheboygan for a period of ten weeks and then returned
to her home.  The bone was united perfectly, but plaintiff's
left ankle was stiff as a result of the long disuse.
    Plaintiff contends that defendants were negligent in the
following respects: (1) In the application of a weight of
twenty-six pounds to the broken leg, which caused the ends
of the bones at the point of fracture to separate; (2) that
the defendants discharged the plaintiff as cured on De-
cember 20th and directed the plaintiff to use her injured
leg, when in fact there was no union and the fracture was

not healed; (3) for the reason that the defendants did not call to see the plaintiff or inspect her leg for about eight days after removing the apparatus; (4) that no X-ray picture of plaintiff's broken leg was taken up to the time she was removed to the hospital on December 28th.

The case was submitted to the jury, and they returned a special verdict finding (1) that the defendants did not use ordinary care and skill as physicians and surgeons in the treatment of the fractured leg; (2) that the present stiffened condition of plaintiff's left ankle was the natural and probable result of the failure of the defendants to use ordinary care and skill; (3) that the plaintiff's failure to exercise ordinary care contributed to produce the present stiffened condition of her ankle; and (4) assessed plaintiff's damages at $1,800. There were seasonable motions on the part of the defendants, and after argument the court directed judgment for the plaintiff in the sum of $1,800, and from judgment rendered pursuant thereto both the defendants appeal.

For the appellants there was a brief by *Allen D. Young* of Sheboygan and *Lines, Spooner & Quarles* of Milwaukee, and oral argument by *Mr. Young* and by *Mr. Charles B. Quarles.*

*Charles Voigt* of Sheboygan, for the respondent.

ROSENBERRY, J. The errors assigned by the defendants raise the question whether or not there was sufficient evidence to sustain the verdict of the jury. In the first place it is to be noted that the plaintiff's claim to compensation is based upon the condition of her left ankle and for pain and suffering in so far as the same are due solely to the negligence found by the jury. The court did not submit to the jury the question of whether or not the failure of the bone to unite was due to the negligence of the defendants, but the damages are limited by the special verdict and the instructions of the court thereon to such damages as the plaintiff sustained by reason of the stiffened condition of her ankle and for pain and suffering as stated. The evi-

dence very strongly supports the proposition that the defendants adopted a correct method of treatment and the one in ordinary use in the vicinity. It appears without dispute that in ordinary cases of fracture the healing is by means of an exudate at the ends of the bone which unites forming a 'soft tissue, then becoming bony and causing a permanent union. It is undisputed in this case that prior to the operation there was never any exudate on the ends of the bones. Dr. Crosby, expert for the plaintiff, said: "If the bones had been held somewhat apart there generally still is an attempt at union. In other words, nature would attempt to repair the broken fragments. It would send out callus, and if that can reach across, why, it might go together." All the medical testimony, including that of Dr. Crosby, shows that there are a certain percentage of cases in which nature makes no effort to unite the fragments, and there is no dispute that it was the situation in this case. The medical testimony further shows that there may be such a failure of nature in cases where absolutely correct treatment has been given and correct methods followed. There is no evidence to show that there was any greater stiffening of the ankle at the end of the seven weeks' period, when the extension was removed, than should be expected in cases of this character. Upon the trial it was stated that no claim was made of any negligence at or subsequent to the time of the removal of the plaintiff to the hospital, and that on the contrary the services of Dr. Genter were entirely proper and satisfactory.

It is established by the overwhelming weight of evidence in this case that the claimed negligence had nothing to do with the failure of nature to commence the healing process. If there had been a proper amount of exudate and it appeared that the failure of the fragments to unite was due to the fact that they were held so far apart that the ends could not be united, a different situation would be presented, but there is not a syllable of such testimony in the case. The

failure of nature to commence a healing process is sometimes due to one cause and sometimes to another and sometimes no cause whatever can be assigned.    It seems purely and wholly speculative to say that the non-union in this case was due in any degree to the negligence of the defendants.

The court instructed the jury on the first question as follows:

"Whether the broken ends of the bone were put in proper apposition by the doctors in the first instance; whether those ends were drawn apart or kept apart by the weights after the fracture had been reduced; whether it was negligence on the part of the defendants or of either of them to tell the plaintiff to use the leg on the assumption or belief—on the assumption or belief that the broken ends had become united, when the fact was that they were not united; whether in the disunited condition of the broken ends it was or was not negligence on the part of the defendants, or either of them, not to have called on the plaintiff within a period of about seven days after the weights had been removed and the leg had been released from the splints or box; whether the weights were too heavy; whether the left foot was or was not kept in a proper position while in the fracture box or in the splints; and whether the pull of the weights and the position of the left foot did or did not have anything to do with causing the present stiffened condition of the left ankle; and whether the omission on the defendants' part to take or cause to be taken an X-ray picture of the fracture before that was done, are each and all matters as to which the evidence relating thereto is to be considered by you in answering this first question."

To submit the issues in this case to the jury under such broad instructions as these is simply to permit the jury to speculate as to the probable cause of plaintiff's injuries.  Dr. Crosby, plaintiff's expert, testified on his direct examination that proper treatment did not require the use of a weight, and described another method of treatment.   He did not testify that the method adopted by the defendants was an improper method, and on cross-examination testified that Buck's extension apparatus was in general use in that vicin-

ity for the treatment of fractures of the tibia.  He also said that the amount of weight to be applied was a matter of judgment and depended upon the circumstances in each case.  There is no evidence in the case to show that the bones were not properly placed in apposition to each other and there is no evidence to show that the weights were not properly attached in the usual and customary way.  If an expert cannot say that the treatment was improper, upon what ground can the jury arrive at that conclusion?  The fact being established that there was no union, it is assumed apparently that it must be due to some negligent treatment. The evidence does not sustain that view.  The entire case here rests upon the testimony of a physician to the effect that he would have treated the fracture in another way. Physicians are not compelled to choose at their peril between two accepted methods of treatment.  Statements of experts that they would have treated the fracture in some other way are incompetent. *Staloch v. Holm,* 100 Minn. 276, 111 N. W. 264, 9 L. R. A. n. s. 712. The whole evidence is that there is no ankylosis, properly so called, of the ankle joint, but the present stiffened condition of the plaintiff's foot is due to failure to use the foot and to a shortening of the cords, which can be remedied by use or by a simple operation.

The court further correctly instructed the jury:

"A physician and surgeon is not an insurer or guarantor of a cure.  If the treatment in this case was such as physicians or surgeons of ordinary knowledge and skill, of the same school of medicine and practicing in the same vicinity, would have exercised under the same or similar circumstances, then the fact that a bad result followed from the treatment, if you find that that was the fact, is not in itself alone sufficient to charge the defendants or either of them with negligence."

The difficulty seems to be that the trial court entirely ignored the undisputed fact that the failure of the fragments to unite was due to some cause with which the treat-

ment administered by the defendants had nothing whatever to do, that is, the failure of nature to set up the healing process. This failure of nature to act made necessary the operation and necessarily continued the period of disuse of the foot, to which the stiffening of the ankle joint was due. There being no evidence that the condition of the ankle joint at the time the dressings were removed was different in this case than it should have been in an ordinary case, there is no causal connection between the claimed negligence of the defendants and the injury sustained by the plaintiff.

There is one claim of negligence as to which there is sufficient evidence to sustain the finding of the jury, and that is that the defendant *Voskuil* was negligent in not discovering the fact that the injury had not healed at the time of the removal of the extension apparatus and in defendants' further failure to call upon the patient for seven or eight days thereafter. However, there is no evidence showing that this in any way contributed to or was a factor in producing the injury complained of. In fact, the attempted use of the leg during that week, so far as the stiffness of the ankle joint is concerned, would have been helpful rather than otherwise.

It is claimed that the defendants were negligent and guilty of careless and unskilful treatment of the plaintiff because they failed to cause an X-ray picture of plaintiff's broken leg to be made while they were treating it. At the time of her injury plaintiff lived at Cedar Grove. There was no X-ray apparatus at or near that place, and there was no suitable electrical current available. Neither does it appear from the testimony that, had an X-ray picture been taken during the treatment, it would have shown that no callus was being formed at the point of fracture. Notwithstanding, the court submitted to the jury the question whether or not the failure of the defendants to take or cause to be taken an X-ray picture was negligence on the part of the defendants. Plaintiff's attorneys cite us to no case holding

that it is as a matter of law negligence for an attending physician and surgeon to fail to avail himself of the use of an X-ray apparatus in the case of fracture, and upon the facts shown here we cannot so hold, particularly as in this case it was comparatively easy to determine whether or not the ends of the bones were in apposition. *Snearly v. McCarthy* (Iowa) 161 N. W. 108; *Wells v. Ferry-Baker L. Co.* 57 Wash. 658, 107 Pac. 869, 29 L. R. A. N. s. 426. It does not appear at what stage of the healing period, if at all, an X-ray would have disclosed whether or not a callus was being formed, and we shall not now attempt to determine under what circumstances the failure of an attending physician and surgeon to use an X-ray apparatus in cases of fracture should be held to be evidence from which an inference of negligence or unskilful treatment may be drawn. It is clear that under the facts in this case the failure to procure an X-ray during the course of treatment did not amount to negligence or unskilful treatment.

*By the Court.*—Judgment reversed, and cause remanded to the circuit court with directions to dismiss plaintiff's complaint upon the merits.